USDC SCAN INDEX SHEET

















AV1   2/13/03   13:42
3:03-M -00356   USA V. ORTIZ
*1*
*CRCMP.*

Affidavit in Lieu of Indictment

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

FILED

03 mg 0356

Magistrate's Docket No.
Case No.

The accused _Jonah M. ORTIZ_, now presented before _Ruben Brooks_, United States Magistrate Judge, Southern District of California, for arraignment and fixing of bail, has been charged by a federal grand jury by way of an indictment in the _____ District of _Hawaii_ on _12-11-02_, with the offense(s) of _Conspiracy and the Distribution of Methamphetamine_ _____ in violation of Title _21_, United States Code, Section _846; 841(a)(1); and 841(b)(1)(A)._

The arrest warrant was issued on _12-12-02_.

Bond **HAS/HAS NOT** been recommended by an Assistant U. S. Attorney in the district in which the charges are pending [in the sum of _No bail_ ].

DATED: _02-13-03_.

_____
Affiant

_Special Agent_
Title

Lodged with me this _13th_ day of _Feb._, 20_03_, in lieu of certified copy of the indictment against the accused.

_____
**HONORABLE**
United States Magistrate Judge

AO 422 (Rev. 12/85) Warrant for Arrest

# UNITED STATES DISTRICT COURT
### District of Hawaii

UNITED STATES OF AMERICA

UNITED STATES
ATTORNEY

'02  DEC 12  A9:28

v.

JONAH MELQUIDAS ORTIZ

(Name and Address of Defendant)

**WARRANT FOR ARREST**

Case Number: CR02-00522HG

YOU ARE HEREBY COMMANDED TO ARREST JONAH MELQUIDAS ORTIZ and bring him or her forthwith to the nearest district/ magistrate judge to answer an Indictment , charging him or her with (brief description of offense)

COUNTS 1-2:
KNOWINGLY AND INTENTIONALLY DISTRIBUTE METHAMPHETAMINE

in violation of Title 21 United States Code, Section(s) 846, 841(a)(1) and 841(b)(1)(A).

| Walter A.Y.H. Chinn | Clerk U.S. District Court |
|---|---|
| Name and Title of Issuing Officer | Title of Issuing Officer |
| Signature of Issuing Officer/Deputy Clerk | 12/11/02 at Honolulu, Hawaii |
| | Date and Location |

SEAL

Bail Fixed at NO BAIL WARRANT    By: Kevin S. C. Chang, United States Magistrate Judge

SEALED
CLERK OF THE COURT

| RETURN | | |
|---|---|---|
| This warrant was received and executed with the arrest of the above-named defendant at | | |
| 1402 BROADWAY, SAN DIEGO CA 92107 | | |
| Date Received<br>DEC 15, 2002 | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
| Date of Arrest<br>FEB 12, 2002 | STEVE A. SIGAY, TFO | |

EDWARD H. KUBO, JR.
United States Attorney
District of Hawaii

S E A L E D
BY ORDER OF THE COURT

ELLIOT ENOKI
First Assistant U.S. Attorney

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

DEC 11 2002

at ___ o'clock and ___ min. ___ M.
WALTER A. Y. H. CHINN, CLERK

MICHAEL K. KAWAHARA
Assistant U.S. Attorney
Room 6100, PJKK Federal Building
300 Ala Moana Blvd.
Honolulu, Hawaii 96850
Telephone: (808) 541-2850

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

HG

UNITED STATES OF AMERICA,   )   CRIM. NO. _____ CR 02-00522
                            )
              Plaintiff,    )   INDICTMENT
                            )   [21 U.S.C. 846]
     vs.                    )
                            )
JONAH MELQUIDAS ORTIZ,      )
                            )
              Defendant.    )
_____)

INDICTMENT

Count 1:

The Grand Jury charges that:

From a time unknown to the Grand Jury up through and including on or about April 6, 2002 in the District of Hawaii and elsewhere, defendant:

JONAH MELQUIDAS ORTIZ

knowingly and intentionally conspired with Christopher Mundon, the latter not being charged as a defendant herein, and others

known and unknown to the Grand Jury, to distribute and to possess
with intent to distribute five-hundred (500) grams or more of a
mixture or substance containing a detectable amount of
methamphetamine, its salts, isomers, or salts of its isomers, a
Schedule II controlled substance,

A violation of Title 21, United States Code, Section
841(a)(1).

<u>Overt Acts</u>:

In furtherance of this conspiracy and in order to attain the
objects thereof, the following overt acts, among others, were
committed in the District of Hawaii and elsewhere:

1.  On or about March 28, 2002 in San Diego, California,
Ortiz possessed approximately 888.2 grams (net weight) of
methamphetemine.

2.  On or about March 28, 2002 in San Diego, California,
Ortiz presented at a "Mail Boxes Etc" the following parcel, which
contained the methamphetamine referenced in Overt Act #1:

> One (1) parcel tendered for delivery via United Parcel
> Service (UPS) to Courtney Greg, 74-5031 Mamalahoa Hwy,
> #3B, Holualoa, HI, and the sender being Jason New, La
> Jolla Mesa Dr, San Diego, CA (hereianfter "subject
> parcel").

3.  On or about April 3, 2002 on the Island of Hawaii,
Mundon spoke on the telephone to a cooperating individual ("CI")
about the subject parcel;

4.  On or about April 4, 2002 on the Island of Hawaii,

2

Mundon spoke on the telephone to the CI about the subject parcel;

5.   On or about April 5, 2002 on the Island of Hawaii,
Mundon took delivery of the subject parcel.

6.   On or about April 5, 2002 on the Island of Hawaii,
Mundon opened the subject parcel.

All in violation of Title 21, United States Code, Sections
846, 841(a)(1), and 841(b)(1)(A).


Count 2:

The Grand Jury further charges that:

On or about March 28, 2002 in the District of Hawaii and
elsewhere, defendant:

**JONAH MELQUIDAS ORTIZ**

knowingly and intentionally attempted to distribute five-hundred
(500) grams or more of a mixture or substance containing a
detectable amount of methamphetamine, its salts, isomers, or
salts of its isomers, a Schedule II controlled substance,

All in violation of Title 21, United States Code, Sections

3

846, 841(a)(1), and 841(b)(1)(A).

DATED: Honolulu, Hawaii, December 11, 2002.

A TRUE BILL.

GRAND JURY FOREPERSON

EDWARD H. KUBO, JR.
United States Attorney

ELLIOT ENOKI
First Assistant U.S. Attorney

MICHAEL K. KAWAHARA
Assistant U.S. Attorney

USA v. Ortiz, USDC-Hawaii, Indictment.

4

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

IN THE UNITED STATES DISTRICT COURT

APR 0 8 2002

FOR THE DISTRICT OF HAWAII

at 1̲2̲o'clock and 0̲3̲min 1̲9̲
WALTER A. Y. H. CHINN, CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | MAGIS. NO. 02-0 188KSC |
| | ) | |
| Plaintiff, | ) | CRIMINAL COMPLAINT |
| | ) | |
| VS. | ) | |
| | ) | |
| CHRISTOPHER MUNDON,    (01) | ) | |
| RICHARD GLASER, aka    (02) | ) | |
| "Richie", | ) | |
| DESI LAPINID,    (03) | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## CRIMINAL COMPLAINT

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

From a time unknown up through and including on or about April 5, 2002 in the District of Hawaii and elsewhere, defendants above-named knowingly and intentionally conspired to distribute and to possess with intent to distribute 500 grams or more of methamphetamine, a Schedule II controlled substance, and various quantities of cocaine, a Schedule II narcotic controlled substance,

In violation of Title 21, United States Code, Sections 846, 841(a)(1) and 841(b)(1)(A).

I further state that I am a DEA Special Agent and that this Complaint is based upon the facts set forth in the attached "Agent's Affidavit in Support of Criminal Complaint", which is incorporated herein by reference.

ORIGINAL SIGNED BY

Sworn to before me and subscribed in my presence, this 7th day of April 2002, at Honolulu, Hawaii.

RICHARD A. JONES
COMPLAINANT

ORIGINAL SIGNED BY

SEAL

SUSAN OKI MOLLWAY
U.S. District Judge

## AGENT'S AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

RICHARD A. JONES, after being duly sworn, deposes and states as follows:

1.  I am a DEA Special Agent assigned to the Airport Drug Task Force, Honolulu International Airport, HI.

2.  On or about February 21 and 22, 2002, a cooperating individual ("CI") arranged to buy one ounce of methamphetamine from defendant Christopher Mundon in Kailua-Kona, Island of Hawaii for $2,000. Mundon also advised the CI that another person named "Richie" would actually deliver the drugs. The CI subsequently contacted "Richie", and on February 22, 2002, "Richie" sold one ounce of methamphetamine (confirmed by field-test) to the CI for the agreed-upon price. "Richie" also advised the CI that he was staying in Mundon's basement for a couple of weeks.

3.  The CI continued to remain in contact with Mundon for the purpose of acquiring more methamphetamine. In their telephone dealings, Mundon used a code to identify different drugs; the word "new" meant methamphetamine and the word "old" meant cocaine.

4.  On March 28, 2001, a parcel had been tendered for delivery in San Diego, CA, via United Parcel Service (UPS) to Courtney Greg, 74-5031 Mamalahoa Hwy, #3B, Holualoa, HI (hereinafter "subject parcel"). The sender of the subject parcel was "Jason New", La Jolla Mesa Dr, San Diego, CA. Hidden in the interior of a videocassette recorder (VCR) in the subject parcel were two bundles consisting of eight (8) "Foodsaver"-brand heatsealed bags and other wrappings containing an estimated one kilogram of methamphetamine (confirmed by field-test).

5.  A controlled delivery of the rewrapped subject parcel under police surveillence was planned.

(A) For this purpose, Hawaiian rock salt in eight "Foodsaver" bags and other similar wrappings were substituted for the real methamphetamine in the VCR and an electronic "beeper" device was emplaced within the VCR.

(B) The two exterior "Foodsaver" bags for each pseudo-drug bundle were also dusted with a florescent powder which would become visible when exposed to UV light. The "beeper" was set up in such a way to signal when the VCR itself was opened and/or the pseudo-drug bundles removed.

6.  On Tuesday, April 2, 2002, a police officer posing as a

UPS deliveryperson made two efforts to deliver the rewrapped subject parcel to the delivery address, apartment #3B, 74-5031 Mamalahoa Hwy.

(A) The first attempt was on Tuesday morning; however, no one was home at this time, and a delivery notice was left at the apartment.

(B) On Tuesday afternoon, a woman was present at the apartment, but she refused to accept the parcel, claiming that she was not the addressee (Courtney) and that Courtney would be back tomorrow. The undercover officer advised that the parcel could be picked up at the UPS office at Kona International Airport.

7. On Wednesday evening, April 3, 2002, the CI had a telephone call with Mundon, in which Mundon discussed this parcel as follows:

Mundon: Brah, the thing, the thing been here, the funky thing is the thing been here for three days.

CI: Oh, no shit.

Mundon: Yeah, it's been on this island for three days. For three days in a row. When the thing went up to the house, the thing nobody was there for accept 'um.

CI: Fuck.

Mundon: But now, all of a sudden, she going, oh that, now the company said what you like 'um you gotta go down there and pick 'um up. And I, and I guess she like, oh, fuck that, I told her, I just told her to have it sent back. I was like, what the fuck you did that for? You only making it more obvious.

CI: Yeah, why if nobody like grab the box, I grab 'um.

Mundon: But I, I gotta see where the thing stay at, though, right now.

8. Just before noon on Thursday, April 4, 2002, Mundon had another telephone call with the CI, in which Mundon again discussed the parcel, as follows:

Mundon: ... 'Cause the thing is, the thing is, that the chick went tell the, the place for send the box back.

2

So that's just, no way, brah.  That's too hot right there already.  There's no, like my friend said, 'Why the fuck did she do that'?

CI: Ah ha.

Mundon: So why she told 'em 'Oh, that's all right, just send the box back'.  You know nobody going fucking do that.

CI: Yeah.

Mundon: Fucking stupid, brah.  She's so fucking dumb.

9.  In addition, during this same Thursday (4/4/02) telephone call, Mundon told the CI that "when I get 'um here, then I give you one call".  Mundon also said that "all I get right now is the **old stuff**", and that "I no more none of the **new**".  As indicated earlier in this Affidavit, Mundon referred to cocaine as "old" and to methamphetamine as "new".

10.  In addition, on the same day (Thursday, 4/4/02) that Mundon had this last telephone call with the CI, someone identifying himself as "Jason" also called UPS to inquire about the subject parcel.  "Jason" was advised that the parcel would be available for pickup at the UPS office on Friday, April 5, 2002.

11.  On Friday, April 5, 2002, an adult woman came to the UPS office at Kona International Airport and picked up the rewrapped subject parcel.  Police surveillence thereafter followed her Toyota pickup truck.  The Toyota pickup thereafter met with a Toyota Celica, and from the "beeper's" signal, it was determined that the subject parcel must have been switched to the Toyota Celica.

12.  At about 3:00 p.m. on April 5, 2002, the "beeper" indicated that the VCR and/or pseudo-drug bundles in the subject parcel were being handled.  The Toyota Celica was also observed parked in front of a two-story residence at 75-5532 Kealia Street, Holualoa, HI.

13.  75-5532 Kealia Street is the residence of Christopher Mundon.  Co-defendant Richard Glaser also resided in first floor of this residence.  Both Mundon and Glaser were present at the residence at this time.  In addition, co-defendant Desi Lapinid (who was the operator of the Toyota Celica) was also at the residence.

3

14.  During the ensuing search of 75-5532 Kealia Street, the following, among other things, were recovered from the residence:

(A) The subject parcel had been opened and was found on the residence's second floor.  All eight (8) "Foodsaver" plastic bags had been cut open and were now empty; six of the bags were in the kitchen, and two were in a bathroom.  Hawaiian rock salt of the type used in this controlled delivery- was found on the bathroom floor near the toilet, and there was also crystalline sediment in the toilet bowl itself.

(1) When exposed to UV light, police officers detected florescent powder on: (i) the fingertips and palms of both of Mundon's hands; (ii) the fingers of both of Glaser's hands; and (iii) the fingertips of both of Lapinid's hands.

(B) In the kitchen, an unregistered .38 caliber revolver, and trafficking paraphernalia such as a scale and numerous, small plastic ziplock bags.

(C) In the living room, the cellular telephone which Mundon had used to contact the CI.

(D) In the residence's first floor bedroom (occupied by Glaser), a backpack containing an estimated 1-2 ounces of cocaine (confirmed by field-test).  There was also a gram scale and similar plastic ziplock bags in the bedroom closet.

(E) In the first floor hallway outside of Glaser's bedroom, the cellular telephone which "Richie" had used to contact the CI.

15.  Lapinid's Toyota Celica was also searched.  In the vehicle's front passenger seat was a black bag containing approximately $63,992.31 in cash and coin.  This bag also contained mail addressed to Tia Vasconcellos (Mundon's girlfriend).  On the rear seat was another camoflage-colored bag which contained $32,940 in cash and an estimated ten (10) ounces of cocaine (confirmed by field-test); this cocaine was already pre-packaged in separate plastic bags in spproximately one ounce lots.

16.  The defendants were arrested at approximately 3:10 p.m. on April 5, 2002.

17.  Subsequent to his arrest, Lapinid advised, among other things, as follows: He had been at Mundon's residence on the afternoon of April 5 and knew that Mundon was a drug dealer.

4

73

Mundon had asked Lapinid to drive him down the road in the
Celica.   Lapinid had been thinking of dealing cocaine for Mundon
on a small scale so he would not be caught, and he asked Mundon
about this during the car ride.   Following Mundon's directions,
they met up with two females in a Toyota pickup truck.   Mundon
gave the pickup truck's female driver a paper bag containing
money, and he received from her a box.   After returning back to
Mundon's residence, Mundon took the box into the residence.
Lapinid also later heard Mundon on the telephone saying words to
the effect of what the fuck is with the Hawaiian salt.   In
addition, Lapinid advised that when Mundon had initially gotten
into the Toyota Celica on the way to pick up the box, Mundon had
brought the two bags (i.e., the black and camoflage bags
mentioned earlier) into the passenger compartment.

FURTHER AFFIANT SAYETH NAUGHT.

ORIGINAL SIGNED BY

RICHARD A. JONES

This Criminal Complaint and Affidavit in support thereof were
presented to, approved by, and probable cause to believe that the
defendants above-named committed the charged crime found to exist
by the undersigned Judicial Officer at 2:50 p.m. on April 7,
2002.

Subscribed and Sworn to Before Me,
this 7th Day of April 2002.

ORIGINAL SIGNED BY

SUSAN OKI MOLLWAY
U.S. District Judge
District of Hawaii

5

## DECLARATION OF JESSE FOURMY

JESSE FOURMY, upon penalty of perjury in accordance with 28 U.S.C. 1746, declares and states as follows:

1. I have been a Special Agent with the U.S. Drug Enforcement Administration ("DEA") since October 1996. From October 2001 to the present time, I have been assigned to the Hilo Post of Duty on the Island of Hawaii, State of Hawaii. During my career as a DEA Special Agent, I conservatively estimate that I have been involved in at least one-hundred drug trafficking investigations. I have also participated in the searches of the residences of suspected drug traffickers for illegal drugs and other non-drug evidence of drug trafficking on at least two-hundred occasions.

2. In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following kinds of drug trafficking-related evidence have typically been recovered: (1) books, records, receipts, notes, ledgers and other papers relating to the distribution of controlled substances; (2) personal books and papers reflecting names, addresses, telephone numbers, and other contact/identification data relating to the distribution of controlled substances; (3) Cash, currency, and records relating to income and expenditures of money and wealth relating to controlled substances, as for example, money order, wire transfer and cashier's check receipts, bank statements, passbooks, checkbooks, and check registers. In addition, during the course

of said residential searches, the agents have also found items of personal property which tend to identify the person(s) in residence, occupancy, control or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

3. Based upon my experience and training, as well as the corporate knowledge and experience of other agents and police officers with whom I have been associated during my career, I am aware that it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (i.e., sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Additionally, telephone/address listings of clients and suppliers necessarily must be maintained and immediately available in order to efficiently conduct their drug trafficking business. Moreover, it is also a generally common practice for traffickers to conceal at their residences large sums of money, either the proceeds from drug sales or to be utilized to purchase controlled substances. In this connection,

2

drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

4. My awareness of these drug trafficking practices, as well as my knowledge of drug use and distribution techniques as set forth in this Affidavit, arise from the following: (a) my own involvement in prior drug investigations and searches during my career as a law enforcement officer, as previously described; (b) my involvement on a number of occasions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as what other agents and police officers have advised me when relating the substance of their similar debriefings and the results of their own drug investigations; and (c) other intelligence information provided through law enforcement channels.

5. Methamphetamine in crystallized or "rock" form (sometimes referred to in the drug slang as "crystal", "ice", "meth", "crystal meth", "crystals", "shabu" [Japanese slang term] or "batu" [Filipino slang term]) is ingested into the body by smoking in glass pipes (the crystals vaporize when subjected to intense heat from butane torches, lighters, and the like, and the vapors are then inhaled) and in recent times has become a very popular drug among abusers in Hawaii. Methamphetamine is not

3

presently manufactured to a significant extent in the State of
Hawaii.  Source areas for methamphetamine are generally located
in the far east (clandestine labs producing the drug are believed
to be located in South Korea, Taiwan, Japan and the Philippines,
among other places), and also the west coast of the mainland
(suspected labs being located in California, Oregon, and
Washington).  Consequently, it would be a common practice for
methamphetamine traffickers in Hawaii to have the drug sent to
them from the mainland and elsewhere via U.S. Postal Service
parcel post/express mail or by way of private, small parcel
service carriers and airline cargo/freight service.  Similarly,
it is also a common practice for said traffickers in Hawaii to
send cash payments or other forms of remuneration back to their
mainland and overseas drug sources via the same means.  Such mail
and small parcel service necessarily results in the generation of
various air freight/cargo documents for said shipments, which
typically are also kept in residences.  Alternatively, such
methamphetamine traffickers would have to themselves travel (or
pay and arrange for others to travel on their behalf) to or from
the State of Hawaii to acquire and import the drug here.  Such
travel necessarily results in the generation of various travel
documents for the traveler, which typically are also kept in
residences.

6.  In a number of residential searches in prior drug
investigations, the above-described drug trafficking records were
found to be maintained electronically on computers and associated

4

electronic storage media (a more specific description would be as follows: computers, external electronic storage media (such as external hard drives and computer disks) and other associated equipment and accessories necessary to examine and record data stored in said computers and storage media (such as monitors, printers, external drives, and other peripherals)). In addition, the larger, small-package carriers such as Federal Express (FEDEX), United Parcel Service (UPS), and DHL maintain computer internet sites which provides customers with tracking information and the status of various shipments within the small package carrier's system (for example, when a customer enters the package's tracking number, the internet site will provide data such as when a given package was received at the origin, when it reached various intermediate hubs enroute, and when it arrived at the destination for delivery). In past drug trafficking investigations involving small package carrier shipments of drugs and drug proceeds (as cash), computers in the residences of suspected drug traffickers were being utilized to track said shipments, which can be ascertained by examining the computer's electronic memory.

### ATTEMPTED UPS SHIPMENT OF ABOUT ONE KILOGRAM OF METHAMPHETAMINE FROM SAN DIEGO TO THE ISLAND OF HAWAII, MARCH 28 - APRIL 5, 2002

7. Attached hereto and incorporated herein by reference is a true and correct copy of that "Criminal Complaint; Agent's Affidavit in Support of Criminal Complaint", which was filed on

April 8, 2002 in the criminal case of <u>USA v. Christopher Mundon,</u> <u>Richard Glaser (aka "Richie"), & Desi Lapinid</u>, U.S. District Court for the District of Hawaii, Magistrate's Case #02-0188KSC (hereinafter referred-to as "Complaint"). I would ask that this Court first read the Complaint in its entirety before proceeding further with this Declaration.

8. The attached Complaint describes a parcel (hereinafter "subject parcel") which had been tendered to a "MailBox, Etc.", commercial establishment in San Diego (hereinafter referred-to as "MBE") on March 28, 2002 for delivery via United Parcel Service (UPS) to Holualoa, HI. Holualoa is located on the Kailua-Kona, or western, side of the Island of Hawaii.

A. The subject parcel contained, among other things, a videocassette recorder (VCR); concealed within that videocassette recorder were plastic bags containing a crystalline substance, which the DEA Southwest Laboratory later determined to be about 888.2 grams (net weight) of 85-96% pure d-Methamphetamine Hydrochloride (a methamphetamine salt and Schedule II controlled substance).

B. DEA-San Diego thereafter sent the subject parcel and its contents to DEA-Hawaii in order to effect a controlled delivery.

9. As further described in greater detail in the attached Complaint, a controlled delivery of the subject parcel (with the

6

real methamphetamine being removed and replaced with a pseudomethamphetamine substance) under police surveillence was attempted on the Island of Hawaii during the period April 2 - 5, 2002. On April 5, 2002 at about 1:00 p.m. (Hawaii time), an adult female later identified as Christina Mauk picked up the subject parcel at the UPS office at the Kona airport and later delivered it to Christopher Mundon. Mundon then took it to his residence in Holualoa, where the parcel was opened. Mundon and his co-defendants Richard Glaser and Desi Lapinid were later arrested at his residence on April 5, 2002.

A. As also indicated in the attached Complaint, a cooperating individual ("CI") had previously effected a controlled purchase of one ounce of methamphetamine from Mundon, with Glaser's assistance, on February 22, 2002 in Kailua-Kona, HI.

10. The sender's name on the subject parcel was "Jason New", with a return address of La Jolla Mesa Dr (no street number given), San Diego, CA. As indicated in the attached Complaint, Mundon had been utilizing in his discussions with the CI codewords of "new" standing for methamphetamine and "old" meaning cocaine. Consistent with this practice, the word "New" on the subject parcel would appear to be the drug supplier's way of signalling to Mundon that this was a methamphetamine shipment.

11. The subject parcel first came to law enforcement's attention at about 9:00 a.m. (Pacific Standard Time) on March 28,

7

2002, when the manager of the aforesaid MBE had contacted DEA in San Diego.  The MBE manager advised that he/she was suspicious of the adult caucasian male who was shipping the subject parcel.  Not wanting potentially hazardous or harmful substances on his/her business premises, the MBE manager, on his/her own initiative, had opened the subject parcel and found that it contained a videocassette recorder.  The MBE manager also opened the top of the videocassette recorder and saw suspected illegal drugs hidden in its interior.  After the DEA Agents arrived at the scene, the MBE manager showed the interior contents of the subject parcel to them, including the videocassette recorder, which still contained the transparent plastic bags of illegal drugs.

12.  The MBE manager further advised the DEA Agents as follows: the person who had presented the subject parcel for shipment on the morning of March 28, 2002, was an adult caucasian male in his late 20's - early 30's, about 5'10" - 6'0" tall, and about 180 - 190 pounds, with brown medium-length wavy hair and dark eyes.  This adult caucasian male had written the shipping label in a sloppy manner.  On this shipping label, the adult caucasian male filled out the sender's and receiver's addresses, and also indicated that the subject parcel's contents were electronics and baby gifts.  The shipping charge for the subject parcel was $147.03 (UPS Second Day Air), and the adult caucasian male said he did not have enough money.  The adult caucasian male

8

then asked about the location of an Automatic Teller Machine (ATM); he left the MBE business premises and then returned several minutes later with more money.  According to MBE records, this adult caucasian male paid the shipping charge in full at about 8:36 a.m. (PST) on March 28, 2002.

13.  This MBE facility is located in the 1800 block on a particular street in San Diego.  There is also a California Federal Bank (with an ATM) located in the 1900 block of the same street, well-within walking distance and only a few minutes away from the MBE.

14.  The California Federal Bank permitted law enforcement officers to review the surveillance camera videotape of its ATM for transactions which occurred during the period 8:00 - 9:00 a.m. on March 28, 2002, as well as corresponding ATM transaction records.  The videotape and transaction records indicated during the approximate time period 8:26 - 8:29 a.m. (PST) on this date, an adult caucasian male had six, consecutive transactions at this California Federal Bank ATM using credit card #4217661302984612; this adult caucasian male obtained a total of $200.00 in cash in five separate $40.00 transactions (NOTE: one additional transaction was not authorized).  Photographs of this adult caucasian male were also copied from this ATM surveillance videotape for identification purposes.

15.  Pursuant to a subpoena, Bank of America advised that

9

according to its records, the cardholder of Visa credit card #4217661302984612 is a "Jonah M. Ortiz", with a mailing address and telephone number of 1666 Garnet Ave, #305, San Diego, CA 92109, (858) 344-8065.

### PERTINENT HISTORICAL INFORMATION
### CONCERNING JONAH M. ORTIZ

16.  According to Hawaii driver's license records, there was a driver's license previously issued (but thereafter revoked) to a "Jonah M. Ortiz", SSN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, date of birth: 3/28/79, with a mailing address of 73-1249 Kaiminani Drive, Kailua-Kona, HI 96740. The expiration date of this license was 3/28/00.  According to these license records, Ortiz' physical description was: height: 6'0" tall; weight: 150 pounds; and brown hair/hazel eyes.

17.  According to Hawaii criminal history records, Jonah M. Ortiz (full name: Jonah Melquiades Ortiz) has been arrested on approximately 55 separate charges on the Island of Hawaii during the period November 1990 - June 2001.  Such charges included: promoting detrimental drugs in July 1996 and promoting dangerous drugs/possession of drug paraphernalia in June 2001, one burglary, four DUI arrests, five assaults, four thefts, two criminal property damage, and four contempt of court violations.  Hawaii County Police Department (HCPD) Officers also obtained several arrest photographs of Ortiz and sent them to DEA-San Diego.

(A) According to HCPD records, a HCPD patrol officer had stopped Ortiz's vehicle in the Kailua-Kona area for traffic

10

violations on or about June 21, 2001.  After determining that
there was an outstanding, state probation revocation warrant for
Ortiz, the officer arrested Ortiz.  An "eight ball" (i.e., 1/8
ounce, or 3.5 grams) of suspected cocaine was recovered from
Ortiz' pants pocket.  During the subsequent search of Ortiz'
vehicle, the following additional evidence was recovered:
approximately 35 grams of suspected cocaine and 0.4 grams of
suspected methamphetamine; a digital gram scale; and $1,840 in
U.S. currency.  On September 10, 2002, in a case entitled <u>State v.
Jonah Melquiades Ortiz</u>, Third Circuit Court Criminal No. 02-1-
0183K, a state grand jury returned an indictment charging Ortiz
with felony drug trafficking/drug paraphernalia crimes and other
traffic offenses relating to this 6/21/01 arrest.  There is also
an outstanding arrest warrant based upon this indictment.

     (B) The Prosecutor's Office for the Third Circuit,
Kailua-Kona, has also advised that Ortiz is currently on state
probation in the case of <u>State v. Jonah Melquiades Ortiz</u>, Third
Circuit Criminal Case No. 98-431.  Ortiz had been convicted of the
felony offense of negligent injury in the first degree on June 9,
1999; he was re-sentenced to five years probation on September 28,
2001 for a prior probation violation.  Furthermore, there is also
an outstanding bench warrant for Ortiz' arrest in this case,
because he failed to appear at a proof compliance hearing before
the Court scheduled for January 30, 2002.

11

## MBE MANAGER'S IDENTIFICATION OF
## ORTIZ' HCPD ARREST PHOTOGRAPH

18. On April 8, 2002 in San Diego, the MBE manager positively identified one of Ortiz' Hawaii arrest photographs as being the guy who shipped the VCR with the white powder. When shown an ATM surveillence photograph of the adult caucasian male (which, as previously indicated in this Declaration, had been obtained from the California Federal Bank in San Diego), the MBE manager also identified him, stating that's him, 10 out of 10, or words to that effect.

A. I have also reviewed an HCPD arrest photograph of Ortiz and one of the California Federal Bank ATM surveillence photographs of the adult caucasian male. It did appear to me that the same person was depicted in both photographs.

## RELEVANT TELEPHONE
## SUBSCRIBER INFORMATION

19. According to subpoenaed ATT Wireless records, "Jonah Ortiz", with a mailing address of P.O. Box 304, 1666 Garnet Avenue, San Diego, CA, was the subscriber of cellphone number (858) 699-0122 during the period March 5 - April 7, 2002.

20. According to subpoenaed Voicestream Wireless records, "Courtney Craig", with a mailing address of 73-1225 Kahi Loop, Kailua-Kona, HI, was the subscriber of cellphone (808) 989-5871.

21. During the search of Courtney Craig and Christina Mauk's apartment on April 5-6, 2002 (74-5031 Mamalahoa Way, Apt. #3B,

12

that is, the destination address listed on the subject parcel),

officers determined that one of the residence telephones located

in this apartment was (808) 334-0577. In addition, Christina Mauk

also utilized cellphone (808) 938-9672 during this relevant time

period.

22. According to subpoenaed Voicestream Wireless records,

"Chris Mundon", with a mailing address of P.O. Box 4744, Kailua-

Kona, HI, was the subscriber of cellphone (808) 989-8360.

**INFORMATION PROVIDED BY CHRISTOPHER MUNDON, RE:
JONAH ORTIZ' INVOLVEMENT WITH THE SUBJECT PARCEL**

23. Mundon, Glaser and Lapinid have already pled guilty in

USDC-Hawaii Criminal #02-0149HG to conspiracy to distribute and to

possess with intent to distribute five-hundred grams or more of

methamphetamine, and are currently pending sentencing.

24. Subsequent to his arrest, Mundon was debriefed by law

enforcement officers in Hawaii and among other things, he stated

the following:

A. Mundon had ordered the two pounds of "ice" (that is,

methamphetamine, 2.2 pounds = one kilogram) from a person named

Jonah Ortiz, for an agreed-upon price of $25,000 per pound, or a

total of $50,000.

B. Ortiz used to live in Kailua-Kona (Island of

Hawaii), until about the end of 2001, when he moved to San Diego.

During the time that Ortiz lived in Kailua-Kona, Mundon used to

supply Ortiz with both "ice" and cocaine. However, after Ortiz

13

moved to San Diego, their roles reversed; Ortiz was able to obtain a Mexican line of supply and he now became Mundon's supplier of "ice". Mundon would acquire "ice" from Ortiz in pound quantities. Ortiz would sell the "ice" to Mundon for $23,000 - 25,000 per pound. Mundon also estimated that he had been purchasing about 2 - 4 pounds of "ice" from Ortiz each month. Mundon had also discussed obtaining cocaine from Ortiz. Ortiz would typically send the drugs to Mundon via a "next day air", small parcel delivery service, addressed to either Courtney Craig's Holualoa apartment (i.e., the destination address indicated on the subject parcel, see attached Complaint), or to Mundon's father in Kona.

C. With respect to the subject parcel, Mundon further stated that:

(1) Mundon said he had a telephone call with Ortiz on or about about Thursday, March 28, 2002. Ortiz advised that the two pounds of "ice" had been expressed mailed to Courtney Craig's apartment and was supposed to arrive the next day. The "ice" was supposed to be contained within a VCR in the parcel.

(a) NOTE: this was consistent with the independently-derived information related earlier in this Declaration that Ortiz had on March 28, 2002 tendered the subject parcel at the San Diego MBE for UPS delivery to "Courtney Greg" and where the methamphetamine was actually found.

(b) NOTE: Subpoenaed toll records indicate

14

that:

(i)  On 3/27/02, three outgoing calls were placed from Mundon's above-mentioned cellphone to Ortiz' above-mentioned cellphone, and on 3/28/02, one outgoing call was placed from Mundon's cellphone to Ortiz' cellphone.

(ii)  On 3/28/02, seven outgoing calls were placed from Ortiz' cellphone to Courtney Craig's cellphone.

(iii) On 3/27/02, four outgoing calls were placed from Mundon's cellphone to Courtney Craig's cellphone, and on 3/28/02, one outgoing call was placed from Mundon's cellphone to Courtney Craig's cellphone.

(2)  Mundon said that he went to Courtney Craig's apartment on Friday (March 29) and the following Monday (April 1), but was advised that the parcel had not arrived.

(a) NOTE: Subpoenaed toll records indicate that:

(i)  On 3/29/02, one outgoing call was placed from Mundon's cellphone to Ortiz' cellphone, and on 3/30/02, four outgoing calls were placed from Mundon's cellphone to Ortiz' cellphone.

(ii) On 3/30/02, two outgoing calls were placed from Ortiz' cellphone to Mundon's cellphone.

(iii)  On 3/29/02, four outgoing calls were placed from Ortiz' cellphone to Courtney Craig's apartment,

15

and three outgoing calls placed from Ortiz' cellphone to Courtney
Craig's cellphone.

      (iv)  On 3/29/02, three outgoing calls
were placed from Ortiz' cellphone to Christina Mauk's cellphone.

      (3) Mundon stated that during the ensuing week,
April 1 - 5, 2002), Ortiz and he remained in telephonic contact.
During these calls, Ortiz advised that there had been attempts by
UPS to deliver the parcel, but no one was home and notices were
left at the apartment.  In addition, Ortiz said that one female
resident at Courtney Craig's apartment had refused to accept
delivery of the parcel.  Ortiz also indicated that he was tracking
the parcel (which can be accomplished via computer using the
parcel's tracking number at UPS internet website) and that the
parcel was going to be sent back to Honolulu if it was not picked
up by Friday, April 1.

      (a)  NOTE: the foregoing facts provided by
Mundon were consistent with the independently-derived information
related in the attached Complaint, as follows: (i) the police's
unsuccessful attempt to effect a controlled delivery on April 2,
when nobody was home and a delivery notice left at the apartment;
(ii) the unknown woman's refusal to accept delivery of the subject
parcel on April 3 at the apartment because she was not Courtney
Craig; and (iii) this explains why Mundon knew about the subject
parcel's delivery status, which he related in two telephone calls

16

to the CI on April 3 - 4, 2002, as also reported in the attached Complaint.

(b) NOTE: Subpoenaed toll records indicate that:

(i) On 4/1/02, one outgoing call was placed from Ortiz' cellphone to Mundon's cellphone.

(ii) On 4/1/02, two outgoing calls were placed from Ortiz' cellphone to Mauk's cellphone, and on 4/3/02, one outgoing call was placed from Ortiz' cellphone to Mauk's cellphone.

(iii) On 4/3/02, one outgoing call was placed from Mundon's cellphone to Courtney Craig's cellphone, and on 4/4/02, one outgoing call was placed from Mundon's cellphone to Courtney Craig's cellphone.

(iv) On 4/1/02, three outgoing calls were placed from Mundon's cellphone to Ortiz' cellphone, and on 4/2/02, two outgoing calls were placed from Mundon's cellphone to Ortiz' cellphone, and on 4/3/02, two calls were placed from Mundon's cellphone to Ortiz' cellphone.

(v) On 4/3/02, one outgoing call was placed from Mundon's cellphone to Courtney Craig's cellphone, and on 4/4/02, one outgoing call was placed from Mundon's cellphone to Courtney Craig's cellphone.

(4) Mundon said that on Friday, April 5, 2002,

17

Ortiz telephonically advised him that Christina Mauk (one of Courtney Craig's roommates) was going to be picking up the subject parcel and delivering it to Mundon; in turn, Mundon was supposed to give to Mauk the $50,000 purchase money.  Mundon thereafter contacted Mauk and they agreed to meet at a particular location. Lapinid drove Mundon to the meeting site, where Mundon picked up the subject parcel from Mauk and he gave her the money.  Lapinid and Mundon then returned back to Mundon's residence (75-5532 Kealia Street, Holualoa, HI), where he opened the subject parcel and instead of finding methamphetamine inside the VCR as Ortiz had said, there was Hawaiian rock salt.  After finding the rock salt, Mundon telephonically contacted Ortiz to complain.  Shortly thereafter, police officers entered his residence.

(a) NOTE: Mundon's statements were consistent with the events observed by police officers during the April 5 controlled delivery, as related in the attached Complaint.

(b)  NOTE: Subpoenaed toll records indicate that:

(i) On 4/5/02, four outgoing calls were placed from Ortiz' cellphone to Mauk's cellphone at approximately the following times: 3:14 p.m. PST (1:14 p.m. Hawaii time); 3:45 p.m. PST (1:45 p.m. Hawaii time); 3:48 p.m. PST (1:48 p.m. Hawaii time); and 4:11 p.m. PST (2:11 p.m. Hawaii time).

(ii) On 4/5/02, five outgoing calls were

18

placed from Ortiz' cellphone to Mundon's cellphone at approximately the following times: 2:33 p.m. PST (12:33 p.m. Hawaii time); 3:09 p.m. (1:09 p.m. Hawaii time); 3:34 p.m. PST (1:34 p.m. Hawaii time); 5:07 p.m. PST (3:07 p.m. Hawaii time); and 5:13 p.m. PST (3:13 p.m. Hawaii time).

(iii) On 4/5/02, three outgoing calls were placed from Mundon's cellphone to Ortiz' cellphone at approximately the following times: 1:32 p.m. Hawaii time (3:32 p.m. PST); 1:33 p.m. Hawaii time (3:33 p.m. PST); and 3:02 p.m. Hawaii time (5:02 p.m. PST).

(iv)  On 4/5/02 at about 10:16 a.m., Hawaii time, one outgoing call was placed from Mundon's cellphone to Courtney Craig's cellphone.

(v) On 4/5/02 at about 2:22 p.m., Hawaii time, one outgoing call was placed from Mundon's cellphone to Mauk's cellphone.

WHEREFORE, I believe that based upon the foregoing, there is probable cause to believe that the following property will be present at the current residence of Jonah M. Ortiz:

1.  Books, records, receipts, notes, ledgers and other papers relating to the distribution of controlled substances.

2. Personal books and papers reflecting names, addresses, telephone numbers, and other contact/identification data relating to the distribution of controlled substances.

3. Cash, currency, and records relating to income and expenditures of money and wealth from controlled substances, to wit, money order, wire transfer and cashier's check receipts, and bank statements, passbooks, checkbooks, and check registers.

19

4. Items of personal property which tend to identify the person(s) in residence, occupancy, control or ownership of the premises that is the subject of this warrant, including but not limited to cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

5. Airline tickets, notes and itineraries, airline schedules, bills, charge card receipts, hotel/motel/rent-a-car statements, correspondence with travel agencies and other travel-related businesses, airline/rent-a-car/hotel frequent flier/user cards and statements, passports and other papers relating to domestic/international travel.

6. Waybills, airbills, bills of lading, receipts, delivery notices, and other shipping documentation from the U.S. Postal Service, small package carriers, or common carriers which indicate the shipment of packages and parcels to and from Hawaii.

7. Computers, external electronic storage media (such as external hard drives and computer disks) and other associated equipment and accessories necessary to examine and record data stored in said computers and storage media (such as monitors, printers, external drives, and other peripherals).

8. Bank of America Visa Charge card(s) bearing cardholder #4217661302984612, and all other records and documentation

20

referencing and relating to this charge card account.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE
AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

DATED: Hilo, Hawaii, December 5, 2002.

JESSE FOURMY

21